UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MARQUES T. BARKSDALE                          )
                                              )
    Plaintiff,                             )
                                              )
    v.                                     )   Case No. 2:12-CV-100 JD
                                              )
LAKE COUNTY, INDIANA, et al.,                 )
                                              )
    Defendants.                            )

## OPINION AND ORDER

This is a civil rights case in which the Plaintiff, Marques T. Barksdale, alleges that he

was arrested and detained for over 100 days based on false statements made by an officer in a

probable cause affidavit. The officer had conducted two controlled purchases of crack cocaine

through a confidential informant, and stated in his affidavit that the seller was subsequently

identified as Barksdale. Barksdale was arrested and charged with two counts of distributing

cocaine, but those charges were eventually dropped after Barksdale filed a notice of alibi defense

showing he was actually at work at the time of both transactions. Barksdale then filed this suit,

asserting an array of state and federal claims arising out of those charges. The defendants have

now moved for summary judgment as to all claims, and those motions have been fully briefed.

Barksdale also filed a motion for partial summary judgment, and there are two preliminary

matters relating to the motions for summary judgment as well. For the reasons that follow, the

defendants' motions are granted in part and denied in part, and Barksdale's motion is denied.

## I. FACTUAL BACKGROUND

On October 12 and 13, 2010, Lake County Police Officers conducted controlled buys of

crack cocaine from an individual their confidential informant knew only as "Marcus." On both

occasions, Officer Luis Garcia met with the confidential informant, who then called Marcus[1] to arrange the transaction. Garcia searched the informant for contraband, then drove him to 169th Street in Hammond, Indiana, near the corner of Tapper Street. On the first occasion, Garcia observed the transaction from his car about twenty-five feet away, and saw the informant meet with a black male. The informant then returned to the car and handed Garcia three baggies of crack cocaine that he had purchased. Officer George Pabey and two other officers provided surveillance for the transaction, with Pabey located in his car about 100 feet away from the transaction. Pabey observed the transaction, and saw Marcus enter the lower level apartment at 1024 169th Street after completing the sale.

The officers conducted a similar controlled buy the next day, on October 13, 2010. The informant contacted Marcus to arrange the transaction, and Garcia drove him to the same location. Pabey provided surveillance from the same spot, and observed a black male walk out of the same apartment and meet with the informant. This time, after the informant purchased the drugs, Garcia approached and spoke with Marcus. Garcia introduced himself (presumably with a covert identity) and asked Marcus if he could buy from him directly in the future. Marcus agreed and gave Garcia his phone number.

Almost all of the facts from that point up to the filing of charges against Barksdale are disputed. Garcia claims that when he met Marcus, he saw a tattoo on the right side of Marcus' neck spelling his name in script, but with a "q" instead of a "c." In addition, officers had recorded the license plates of each of the cars parked behind the apartment building where the

---

[1] The informant apparently only spoke the name to the officers, and in his reports, Garcia spelled it as "Marcus," consistent with the name's common, phonetic spelling. Garcia claims to have later identified the individual as "Marques" Barksdale. Because there is a dispute over whether they are the same person, the Court refers to the individual who took part in the controlled buys as "Marcus," and to the Plaintiff as Barksdale.

transactions took place. Garcia testified that he pulled the registration records for each of those cars, and that one of them, an '85 or '89 Chevy Caprice, was registered to Marques Barksdale. Garcia then pulled Barksdale's driving record and his criminal history report. Barksdale's driving record included his driver's license picture, and Garcia testified that he identified Barksdale as Marcus based on that picture because he recognized the "Marques" tattoo that was apparent in the picture. In addition, Garcia testified that Barksdale's criminal history report listed him as living at 1024 169th Street, the same address Marcus was seen leaving or entering during both transactions. Finally, Garcia testified that he compiled a photo line-up containing the pictures of Barksdale and five other comparable individuals, and that the informant identified Barksdale's picture as Marcus. Garcia then called Marcus several times at the number he had given him during their meeting, trying to set up additional buys to further strengthen the case. However, Marcus never returned his calls, so Garcia proceeded to charge Barksdale with the crimes.

These events differ considerably in Barksdale's version of events. First, Barksdale states in his affidavit that he had nothing to do with the controlled buys. He also submitted a letter from his then-employer, stating that he was present at work at the times of both transactions. The letter includes timesheets verifying Barksdale's attendance at work on both days. Thus, Barksdale argues not only that he was not Marcus, but that Garcia could not have observed his tattoo during the second transaction, as he was not there. Barksdale also states in his affidavit that he has never owned a car like the one Garcia testified was registered to him, and that he never lived at the address Garcia testified was listed in his criminal history report. Finally, he disputes that the photo line-up ever took place, as it was never mentioned in any report, and the defendants represented that they are not in possession of any such line-up.

It is undisputed, though, that on December 6, 2010, Garcia signed a probable cause affidavit and an information charging Barksdale with two counts of dealing cocaine, Class B felonies. The probable cause affidavit describes the two controlled buys, referring to the subject as "Marcus," and then states, "The person known as Marcus was subsequently identified as Marques T. Barksdale." [DE 44-3]. A warrant was issued for Barksdale's arrest that same day, and he was arrested by the United States Marshals Service on December 8, 2010. Barksdale had his first appearance in court on December 8, 2010, and had his formal appearance on December 16, 2010, at which time he entered not guilty pleas to both charges. Barksdale was detained without bail through December 23, 2010, after which he was held on $100,000 bail, which he was unable to post. On January 20, 2011, Barksdale's counsel filed a notice of alibi, and she filed a second statement of alibi on March 25, 2011, this time complete with records showing Barksdale was at work at the time of the offenses. On April 1, 2011, the prosecutor dismissed the charges against Barksdale for the reason that "[t]he State cannot establish the identity of the defendant," and Barksdale was released. [DE 51-5]. Barksdale then petitioned to expunge the records of his arrest. The prosecutor stipulated to the expungement on April 28, 2011, and the court entered the expungement order on May 9, 2011.

Barksdale thereafter served a notice of tort claim on July 13, 2011, and filed suit on February 13, 2012. He sued five defendants, including Lake County, Indiana, the Lake County Commissioners, Sheriff John Buncich, Officer Garcia, and Officer Pabey, with the individuals sued in both their individual and official capacities for each claim. The complaint asserts federal claims for malicious prosecution, manufacture of inculpatory evidence, unreasonable seizure, and false arrest, and state law claims for negligence and intentional infliction of emotional distress. Lake County and its Commissioners were later dismissed pursuant to a stipulation, so

only the claims against the individuals are still at issue, and they have now moved for summary judgment as to all claims.

## II. PRELIMINARY ISSUES

There are two preliminary motions to address relative to the affidavit Barksdale filed in opposition to the motions for summary judgment. Sheriff Buncich moved to strike the affidavit [DE 60] because it was not dated. Barksdale responded in opposition to the motion, and also filed a motion for leave to file a dated version of the affidavit [DE 64], which he attached to the motion. No party has responded in opposition to Barksdale's motion, so the Court grants it as unopposed. The motion to strike the initial affidavit is therefore denied as moot.

## III. STANDARD OF REVIEW

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Kerri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006); *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

## IV. DISCUSSION

The defendants have each moved for summary judgment as to all claims against them, and Barksdale has filed a motion for partial summary judgment as to one particular fact. The Court considers the parties' respective motions in turn.

### A. Defendants' Motions for Summary Judgment

Barksdale asserts the same set of claims against each of the three defendants in both their individual and official capacities. The Court addresses the individual capacity claims first, then addresses the official capacity claims.

#### 1. Claims against Officer Garcia in His Individual Capacity

##### a. Malicious Prosecution

Barksdale's first claim against Officer Garcia is for malicious prosecution, which provides a remedy for deprivation of liberty pursuant to legal process. *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013). This claim arises under § 1983 based on an alleged violation of the due process clause of the Fourteenth Amendment. Such claims are not cognizable under the Fourteenth Amendment where state law provides an adequate remedy, *see Parratt v. Taylor*, 451 U.S. 527 (1981), but as the Seventh Circuit held in *Julian v. Hanna*, 732 F.3d 842, 846–48 (7th Cir. 2013), Indiana's grant of absolute immunity to state officers for malicious prosecution claims deprives plaintiffs of adequate state remedies, thus opening the door to federal due process claims. *See also Serino*, 735 F.3d at 593 (reiterating *Julian's* holding that "Indiana state law does *not* provide an adequate remedy for malicious prosecution . . . because the Indiana Tort

Claims Act grants broad immunity to Indiana government units and employees from malicious prosecution actions").

To state a malicious prosecution claim under § 1983, a plaintiff must demonstrate that (1) he has satisfied the elements of a state law cause of action for malicious prosecution; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of liberty. *Welton v. Anderson*, 770 F.3d 670, 674 (7th Cir. 2014); *Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir.1996). Garcia does not address the latter two elements, so the only question is whether Barksdale has satisfied the elements of a state law cause of action for malicious prosecution. Under Indiana law, the elements of a malicious prosecution action are: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in doing so; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor. *Welton*, 770 F.3d at 674; *Alexander v. United States*, 721 F.3d 418, 422 (7th Cir. 2013).

Garcia does not contest the first or fourth elements—by signing a probable cause affidavit and the charging information, he caused the action to be instituted against Barksdale, and the action was terminated in Barksdale's favor when the state dismissed the charges against him. The second and third factors are closely related in this context. If Garcia is to be believed as to the facts before him at the time he signed the probable cause affidavit, then he had probable cause and did not act maliciously in identifying Barksdale as the subject of the controlled buys, even if in hindsight he was mistaken (though he insists he was not). If, however, as Barksdale argues, Garcia is lying about those facts and had no reason to suspect Barksdale as the perpetrator, then he lacked probable cause, and that lack of probable cause, along with Garcia's lies after the fact, support a finding of malice. Since Garcia's probable cause affidavit does not

identify any facts supporting its conclusory statement that "[t]he person known as Marcus was subsequently identified as Marques T. Barksdale," the basis for that statement and the existence of probable cause depend entirely on Garcia's own testimony. However, Barksdale has presented enough evidence to call into question Garcia's testimony about which facts were available to him and supported his identification of Barksdale as the perpetrator, so summary judgment cannot be granted on this claim.

To begin with, the Court notes that there is ample evidence that Barksdale was not actually the "Marcus" who took part in the controlled buys. For one, Barksdale denies that he had anything to do with those transactions, or that he has ever met the confidential informant or Garcia. He further states that he was actually at work when the transactions took place, and he submitted a note from his employer along with time sheets verifying his presence at work at the times of both transactions. Further, though the pictures of Marcus from the controlled buys are difficult to make out, the individual they portray does not resemble Barksdale particularly closely.

Against this backdrop, and viewing the facts in the light most favorable to Barksdale, the bases for Garcia's identification begin to fall away. Garcia testified that he met and spoke with Marcus during the second controlled buy, and that he saw a tattoo spelling the name "Marques" in script on the right side of Marcus' neck. Garcia further testified that he used this tattoo to identify Barksdale as Marcus because he saw the same tattoo in the picture in Barksdale's drivers' license after pulling Barksdale's driving record.[2] However, if it was not actually

_____

[2] Garcia actually testified at his deposition that the tattoo was spelled "Marqu*i*s." None of the parties note this contradiction, but for Garcia to have identified Barksdale based on this tattoo, he would have had to conclude either that he misread the tattoo (even though he insisted even at the time of his deposition that the tattoo was spelled with an "i"), or that Barksdale had misspelled his own name in his own tattoo.

Barksdale whom Garcia met, then either there are two individuals living in the same general area with the same distinctive tattoo on the same part of their body, and Garcia happened to meet the other one, or Garcia did not actually see the tattoo at the time, and made up that detail after the fact to corroborate his identification of Barksdale as Marcus. There is no contemporaneous documentation of Garcia having observed the tattoo, such as in the police report he completed (which would have been a sensible place to record this detail about the identity of the as-of-yet unidentified suspect), so it would be plausible for a jury to find that the latter possibility is true—that if Garcia did not actually meet Barksdale, he did not actually observe Barksdale's distinctive tattoo, and did not use that as a basis for identifying Barksdale as Marcus.

Garcia also testified that he identified Barksdale because he ran the license plate of a car that was parked behind the apartments where the buys took place, an '85 or '89 Chevy Caprice, and that it came back as registered to Barksdale. However, Barksdale denies having ever owned such a car, which casts doubt on whether the report Garcia references actually identified Barksdale as the owner. There is no other corroboration for Garcia's testimony, either, such as the registration record Garcia actually viewed, so on this record, a jury could reasonably disbelieve it. Similarly, Garcia testified that the criminal history report he pulled on Barksdale listed him as living at 1024 169th Street, where Marcus was seen entering after the transactions. But that criminal history report is absent from the record too, and Barksdale denies having ever lived at that address, further calling Garcia's testimony into question.

Finally, Garcia testified that he presented a photo line-up to the confidential informant and that the informant picked Barksdale's photo out of the line-up. There is no evidence besides Garcia's word that this actually took place, though. The lineup itself is not in the record, and apparently no longer exists. Based on the above contradictions, which suffice to create a question

of fact as to Garcia's credibility, a jury could choose to disbelieve Garcia's testimony on this point and find that the informant never actually identified Barksdale as Marcus. *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 815 (7th Cir. 2005) (stating that a plaintiff cannot defeat summary judgment by merely "relying on the hope that the jury will not trust the credibility of [the opposing party's] witnesses," but could do so by providing "affirmative evidence to call in question [the witnesses'] credibility").

When viewing these facts collectively and in the light most favorable to Barksdale, Garcia had no reason at all to believe that Barksdale was Marcus, and thus lacked probable cause to assert that Barksdale had committed the crimes. *See Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) (citing *K Mart Corp. v. Brzezinski*, 540 N.E.2d 1276, 1280 (Ind. Ct. App. 1989) for the proposition that "while a judicial determination of probable cause is *prima facie* evidence of probable cause in a subsequent malicious prosecution suit, that evidence is rebutted if the judicial determination is made in reliance on false information"); *Glass v. Trump Ind., Inc.*, 802 N.E.2d 461, 466–67 (Ind. Ct. App. 2004) ("Probable cause to commence criminal proceedings in this context exists when a reasonable inquiry would induce a reasonably intelligent and prudent person to believe that the accused committed the crime charged."). The complete lack of probable cause in turn supports an inference of malice, as does Garcia's false testimony (again, basing that characterization on the facts construed most favorably to Barksdale) about his basis for identifying Barksdale as Marcus. *Brown v. Indianapolis Hous. Agency*, 971 N.E.2d 181, 186 (Ind. Ct. App. 2012) ("Malice may be inferred from a total lack of probable cause . . . ."); *Williams v. City of Chicago*, 733 F.3d 749, 761 (7th Cir. 2013) (analogizing an officer's after-the-fact fabrications to an employer's pretextual explanations for taking action against an employee in the context of employment litigation, and holding that the

officer's false deposition testimony as to material facts could support an inference of malice). Therefore, the Court concludes that Barksdale has presented sufficient evidence for each of the elements of his malicious prosecution claim.

The last question, then, is whether Garcia is nonetheless entitled to qualified immunity on this claim. However, it was clearly established at the time of the conduct at issue here that officers could face liability for malicious prosecution under federal law where a state does not offer an adequate remedy. *E.g.*, *Newsome v. McCabe*, 256 F.3d 747, 750–51 (7th Cir. 2001) (discussing *Albright v. Oliver*, 510 U.S. 266 (1994)); *Julian*, 732 F.3d at 848 (holding that the officers would not be entitled to qualified immunity against a malicious prosecution claim based on their deliberately wrongful conduct). And the facts taken in the light most favorable to Barksdale show that Garcia acted with malice, and that he did not have any reasonable basis for asserting that Barksdale had been identified as Marcus or for accusing Barksdale of having committed the crimes. Therefore, Garcia is not entitled to qualified immunity, so the Court denies the motion for summary judgment as to the § 1983 claim against Garcia for malicious prosecution in violation of the due process clause of the Fourteenth Amendment.

### b.        Manufacture of Inculpatory Evidence

Barksdale next asserts a claim for "manufacture of inculpatory evidence." Such a claim was previously foreclosed under Seventh Circuit law, which held that evidence fabrication claims were not cognizable under the Fourteenth Amendment. *E.g.*, *Fields v. Wharrie*, 672 F.3d 505, 516–17 (7tn Cir. 2012) ("*Fields I*"); *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010). However, more recent cases have held that in certain limited circumstances, manufacturing inculpatory evidence can give rise to a due process claim under the Fourteenth Amendment. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("*Fields II*"). Barksdale did not present any legal analysis in support of this

claim, though; his brief only cites cases addressing *Brady* claims, and then only in passing, and he makes no attempt to identify the framework for analyzing this emerging claim or to show how the facts here satisfy that framework. The Court therefore grants the motion for failure to adequately develop a legal argument.

This claim would likely fail on the merits, anyway, as the only actual evidence Barksdale references as having been manufactured was a photo line-up in which the informant allegedly identified Barksdale. The record does not show that this evidence was ever used against him, though. It is not mentioned in Garcia's probable cause affidavit, and there is no evidence that it was ever presented to the prosecutor or to the state court. Without that evidence, Barksdale cannot show that he was harmed by this particular violation, which would defeat this claim. *Fields II*, 740 F.3d at 114 ("For if the evidence hadn't been used against the defendant, he would not have been harmed by it, and without a harm there is, as we noted earlier, no tort."). Barksdale also references the withholding of exculpatory evidence—a *Brady* claim—in relation to this claim. However, *Brady* is a trial right, and the charges against Barksdale were dropped prior to any trial, so the claim would fail under that framework as well. *Huon v. Mudge*, No. 13-2966, 2015 WL 54009, at *4 (7th Cir. Jan. 5, 2015) (holding that the plaintiff "has no possible claim under *Brady* concerning the . . . charges that were dismissed before trial"); *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011). The Court therefore grants summary judgment on this claim as to Garcia.

### c.     Unreasonable Seizure and False Arrest

Barksdale next asserts § 1983 claims for an unlawful seizure and false arrest, in two separate counts. However, he does not identify what distinction he is drawing between these two counts, and his brief cites the same case in support of the same proposition for both counts. In addition, that case, *Bentz v. City of Kendallville*, 577 F.3d 776 (7th Cir. 2009), addressed claims

based on warrantless arrests without probable cause. But none of the defendants here arrested Barksdale—he was arrested by the United States Marshals Service—and his arrest was based on a warrant. In light of Barksdale's factual discussions, though, the Court interprets these counts as presenting a single claim for making false statements in support of an arrest warrant, in violation of Barksdale's Fourth Amendment right to be free of unreasonable seizures.

The Fourth Amendment requires probable cause for any arrest, but even though an arrest warrant requires a magistrate to have determined that probable cause is present, "a warrant does not erect an impenetrable barrier to impeachment of a warrant affidavit." *Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011) (quoting *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985)). Rather,

> [i]f an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, not only is his conduct the active cause of the illegal arrest, but he cannot be said to have acted in an objectively reasonable manner.

*Id.* (quoting *Olson*, 771 F.2d at 281). As discussed above relative to the malicious prosecution claim, there is a genuine dispute as to each of the facts Garcia claims to have relied on in support of his statement in the probable cause affidavit that "[t]he person known as Marcus was subsequently identified as Marques T. Barksdale." Resolving those disputes in Barksdale's favor for the purposes of summary judgment, Garcia had no reason to believe that Barksdale was Marcus, and thus would have known at the time he signed the affidavit that the statement was false. Further, without the statement in the affidavit identifying Barksdale as the individual who conducted the drug transactions, there would have been no probable cause to arrest Barksdale for those offenses. Therefore, the Court cannot grant summary judgment on the basis that no constitutional violation occurred.

Garcia is not entitled to qualified immunity on this claim, either. As the Seventh Circuit noted in *Lawson*,

> if [the officer] had knowingly included this false information, then he also would not be entitled to qualified immunity because it was clearly established "that a warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue."

637 F.3d at 705 (quoting *Know v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003), and citing *Michael C. v. Gresbach*, 526 F.3d 1008, 1013 (7th Cir. 2008)). The same analysis applies here, so the Court denies the motion for summary judgment as to Barksdale's § 1983 Fourth Amendment claim against Garcia for submitting false information in support of an arrest warrant.

### d.  Intentional Infliction of Emotional Distress

Barksdale also asserts a claim for intentional infliction of emotional distress. Garcia's brief does not address the substance of this claim, but only addresses a procedural obstacle, namely, Barksdale's compliance with the notice requirements of the Indiana Tort Claims Act.[3] Under that Act, "a claim against a political subdivision is barred unless notice is filed . . . within one hundred eighty (180) days after the loss occurs." Ind. Code § 34-13-3-8(a). This applies equally to claims against employees of political subdivisions. *Poole v. Clase*, 476 N.E.2d 828, 831 (Ind. 1985); *Chang v. Purdue Univ.*, 985 N.E.2d 35, 51 (Ind. Ct. App. 2013). Here, Barksdale sent his notice of tort claim on July 13, 2011 so any claim that accrued before January 14, 2011 would be barred unless there are grounds for tolling the limitations period.

---

[3] Garcia also made passing reference to the immunity provisions of the Indiana Tort Claims Act, Ind. Code § 34-14-3-3(8) (immunizing governmental employees from liability for "the adoption and enforcement of or failure to adopt or enforce . . . a law . . . unless the act of enforcement constitutes false arrest or false imprisonment"), but not until his reply brief. He further disclaimed reliance on absolute, as opposed to qualified, immunity, so the Court does not consider at this time whether Garcia enjoys absolute immunity against this claim.

Under Indiana law, "'in general, the cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another.'" *Chang*, 985 N.E.2d at 52 (quoting *Filip v. Block*, 879 N.E.2d 1076, 1082 (Ind. 2008). "For an action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred." *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009).

Here, there are only two actions Garcia is alleged to have taken to inflict injury on Barksdale: signing a probable cause affidavit in support of an arrest warrant, and signing the initial information charging Barksdale with the drug transactions, both of which he did on December 6, 2010. Those actions first inflicted their damage on Barksdale on December 8, 2010, when he was arrested and first appeared in court. Barksdale also had his formal appearance on the charges and entered a plea of not guilty on December 16, 2010. By that time, Barksdale certainly knew, or had reason to know, that he had sustained damage as a result of the arrest warrant and charges against him.

These facts parallel those in *Marten v. Office of the Ind. Attorney Gen.*, No. 1:12-cv-195, 2012 WL 5207617 (S.D. Ind. Oct. 22, 2012), where the plaintiffs asserted a claim for intentional infliction of emotional distress based on charges brought against them that were later dropped. There, the plaintiffs alleged that the defendant made false statements in support of a search warrant and a charging information in 2008. The charges pended for several years before being dropped in 2011, after which the plaintiffs filed their suit. In holding that the claim was time-barred, the court noted that the only tortious conduct at issue took place in 2008 before the criminal charges were initiated, so that the claim accrued at the latest on the date the plaintiffs

were arrested. Likewise here, the only tortious conduct at issue is Garcia's signing the probable cause affidavit and charging information, which he did on December 6, 2010, and which Barksdale would have become aware of on December 8, 2010, or at the very latest on December 16, 2010, at his formal appearance on the charges.

Barksdale also argues that the "continuing wrong" doctrine delays the accrual of this claim. This doctrine applies "'where an entire course of conduct combines to produce an injury'—in other words, when the defendant carries out a continuing wrongful act." *Serino*, 735 F.3d at 591 (citing *Johnson*, 885 N.E.2d at 31). In that event, "the statutory limitations period begins to run at the end of the continuing wrongful act." *Johnson*, 885 N.E.2d at 31; *see also Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir. 2010) (holding that where the officers' tortious conduct continued throughout the prosecution of the charges and through the close of trial, leading to a wrongful conviction, the claim did not ripen until the conviction was overturned). As in *Serino*, though, Garcia's "entire course of conduct" had already concluded by the time Barksdale was arrested. There is no evidence in the record indicating that Garcia had any further involvement in Barksdale's case after signing the probable cause affidavit and the initial information. Granted, Barksdale's detention continued well past that point, but as the Seventh Circuit noted in *Serino*, that "only goes toward the issue of his damages." 735 F.3d at 592.

Barksdale also notes that an amended information was filed against him on January 11, 2011, correcting the date of the second offense, and that he received notice of the amended information on January 20, 2011. However, he offers no reason why that amended information is of any consequence to the accrual date of this claim. Barksdale had already suffered injury by having charges initiated against him, and the amended information, which was not signed by

Garcia, did not add any new or different charges against him; it was merely a procedural step in the course of the prosecution of the same charges he had already been injured for having to face. Therefore, the Court concludes that Barksdale's claim for intentional infliction of emotion distress accrued by December 16, 2010 at the very latest—well before January 14, 2011, the earliest accrual date for which Barksdale's notice would have been timely.

Finally, Barksdale argues that the limitations period should be tolled for three days because he was incapacitated by lockdowns at the jail for that amount of time. However, Barksdale's notice of tort claim was about a month late, so those three days are inconsequential. Therefore, the Court finds that Barksdale failed to comply with the notice provisions of the Tort Claims Act as to his claim for intentional infliction of emotional distress, and grants the motion for summary judgment as to this claim.

### e. Negligence

Barksdale's complaint also contains a count alleging a claim for negligence. However, Barksdale did not defend this claim in responding to the motion for summary judgment, so the Court grants summary judgment as to this claim as to Garcia.

### 2. Claims against Sheriff Buncich and Officer Pabey in Their Individual Capacities

Barksdale asserts each of those same claims against Sheriff Buncich and Officer Pabey in their individual capacities. Those claims can be disposed of easily as to these defendants, though, as Barksdale offered no evidence or even argument that they were in any way involved in the alleged constitutional violations or state torts. Section "1983 lawsuits against individuals require personal involvement in the alleged constitutional deprivation to support a viable claim," so "individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue." *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003)

(internal quotations and alterations omitted); *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614 (7th Cir. 2002) ("It is well-established that a plaintiff only may bring a § 1983 claim against those individuals personally responsible for the constitutional deprivation."). This also means that "'§ 1983 does not allow actions against individuals merely for their supervisory role of others.'" *Palmer*, 327 F.3d at 594 (quoting *Zimmerman v. Trible*, 226 F.3d 568, 574 (7th Cir. 2000)).

Here, there is absolutely no indication that Buncich or Pabey had anything to do with Barksdale's arrest or any of the torts alleged. As to Buncich, the undisputed evidence indicates that he was not even the Sheriff at the time of the events in question, and Barksdale does not allege any personal involvement by Buncich in these events. As to Pabey, his only involvement in these events was that he provided surveillance and backup during the controlled buys. There is no evidence that he was involved in identifying Barksdale as the seller or that he had any role in the issuance of the warrant or the decision to charge Barksdale with those offenses. Accordingly, there is no basis in the record to attach liability to Pabey for any of these claims. The Court therefore grants the motions for summary judgment as to all claims against Buncich and Pabey in their individual capacities.

### 3.    Claims against the Defendants in their Official Capacities

Finally, Barksdale asserted each of his claims against the defendants in their official capacities as well. As to federal claims, claims under § 1983 against government employees in their official capacities are equivalent to claims against their employer, and are subject to the Supreme Court's holding in *Monell* that "'a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'" *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "Unless there is an unconstitutional policy, there cannot be official-capacity

liability; only individual-capacity liability is possible." *Id.* In order to establish an official policy, a plaintiff must provide evidence of an express policy that causes a constitutional deprivation when enforced; of a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or that the constitutional injury was caused by a person with final policymaking authority. *Id.* Here, the record is devoid of evidence that would establish these elements. Barksdale only defends the official capacity claims by arguing that Buncich is a proper party under Federal Rule of Civil Procedure 25(d) even if he was not Sheriff at the time of the events at issue. The problem with these claims, though, is not that Barksdale named the wrong parties, but that he provided no evidence to support them, as he must to survive summary judgment. Therefore, the Court grants summary judgment as to the § 1983 claims against the defendants in their official capacities.

As to the state law claims, Barksdale's claims for intentional infliction of emotional distress and for negligence—the only claims he asserts under state law—fail for the reasons discussed above as to the defendants in their individual capacities. Because there are no underlying state law claims for which the defendants' employer could be vicariously liable, the Court grants summary judgment as to the state law official capacity claims against all defendants.

**B.     Plaintiff's Motion for Summary Judgment**

Barksdale has also cross-moved for partial summary judgment, seeking to invoke res judicata as to the factual issue of whether he actually committed the crimes in question. After the criminal charges against him were dismissed, Barksdale petitioned the state court for expungement of the records of his arrest. The Lake County prosecutor subsequently stipulated to an expungement order, and the state court entered the order on May 9, 2011. Because one of the grounds for expungement is "mistaken identity," Ind. Code § 35-38-5-1, Barksdale asserts that

res judicata bars all of the defendants from re-litigating whether he was the individual who took part in the controlled buys.[4]

Barksdale's argument fails for multiple reasons, two of which the Court will address. First, Garcia, the only defendant against whom any claims have survived, was clearly not a party to the expungement proceeding. The party against which res judicata would apply must have been either a party to or in privity with a party to the prior action. *Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP*, 976 N.E.2d 699, 704 (Ind. 2012); *White v. Allstate Ins. Co.*, 605 N.E.2d 141, 143 (Ind. 1992). Barksdale argues, presumably referring to the defendants in their official capacities, that "the State is the State," so the Lake County Sheriff was a party to the expungement proceeding even though it was prosecuted by the Lake County Prosecutor. Regardless of whether or not that argument is sound, though, it has no application to the defendants in their individual capacities, and Barksdale has not articulated any basis on which the individuals could be considered parties to, or in privity with parties to, the expungement action.

Second, it is not appropriate to apply res judicata in these circumstances anyway. In its typical application, res judicata, also known as collateral estoppel, operates as a defense to an action that a plaintiff has already litigated and lost. *E.g.*, *Nat'l Wine & Spirits*, 976 N.E.2d at 704. Barksdale seeks to invoke res judicata in a different manner, though, not defensively, but "offensively." "Collateral estoppel is termed 'offensive' when . . . the 'plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an

---

[4] To the extent Barksdale argues that res judicata also establishes that he was arrested without probable cause, on the basis that the criminal charges against him were dismissed, that argument would be frivolous. *Beauchamp v. City of Noblesville*, 320 F.3d 733, 745 (7th Cir. 2003) ("All acquittals and terminated prosecutions do not lead to liability under § 1983, however. The only facts relevant to determining whether probable cause existed are those known to the police when they apply for a warrant.").

action with another party." *Kimberlin v. DeLong*, 637 N.E.2d 121, 125 (Ind. 1994). A trial court has "'broad discretion' in deciding whether to permit offensive collateral estoppel" in this context, and must consider "(1) whether the party in the prior action had a full and fair opportunity to litigate the issue and (2) whether it is otherwise unfair to apply collateral estoppel given the facts of the particular case." *Doe v. Tobias*, 715 N.E.2d 829, 831–32 (Ind. 1999). Offensive collateral estoppel may be unfair where, among other situations, "the defendant had little incentive to vigorously litigate the first action either because the damages were small or nominal, or because future suits were not foreseeable." *Id.*; *see Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 332 (1979) (holding that offensive collateral estoppel was proper in part because "the petitioners had every incentive to litigate the [prior] lawsuit fully and vigorously").

That consideration is particularly strong here. The State had no monetary interest in the expungement proceeding; all Barksdale stood to gain was to have the record of his arrest for these charges removed from law enforcement files. However, that is of relatively little consequence to the State, and having already voluntarily dismissed the charges, the State had very little incentive to devote its resources to vigorously litigating the expungement petition. Those incentives manifested themselves here, as the prosecutor stipulated to the expungement rather than oppose it at all. Under these circumstances, the Court finds that applying collateral estoppel based on the expungement order would be manifestly unfair, and declines to do so.[5] Therefore, Barksdale's motion for partial summary judgment is denied.

---

[5] The Court further notes that to hold otherwise would likely mean that prosecutors would have to begin contesting expungement petitions in every instance, for fear that an expungement order could give rise to civil liability. That would be quite disadvantageous to individuals whose interest is simply having their records expunged, and would waste the resources of both the parties and the courts, which would be contrary to the interests res judicata is meant to serve.

## V. CONCLUSION

Buncich's motion for summary judgment [DE 42] is GRANTED, and Garcia and Pabey's motion for summary judgment [DE 46] is GRANTED in part and DENIED in part. Summary judgment is GRANTED as to all claims against all remaining defendants EXCEPT for the § 1983 claims against Garcia in his individual capacity for (1) malicious prosecution, in violation of the due process clause of the Fourteenth Amendment; and (2) making false statements in support of an arrest warrant, in violation of the Fourth Amendment. Plaintiff's motion for partial summary judgment [DE 49] is DENIED. Barksdale's motion for leave to file an amended affidavit [DE 64] is GRANTED, and Buncich's motion to strike [DE 60] is DENIED as moot.

SO ORDERED.

ENTERED:  February 3, 2015

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court